# Application of Section 504 of the Rehabilitation Act To HIV-Infected Individuals

In the non-employment context, section 504 of the Rehabilitation Act protects symptomatic and asymptomatic HIV-infected individuals against discrimination in any covered program or activity on the basis of any actual, past or perceived effect of HIV that substantially limits any major life activity—so long as the HIV-infected individual is "otherwise qualified" to participate in the program or activity.

Section 504 applies in substance in the same way in the employment context. Subject to an employer making reasonable accommodation within the terms of its existing personnel policies, the symptomatic or asymptomatic HIV-infected individual is protected against discrimination if he or she is able to perform the duties of the job and does not constitute a direct threat to the health or safety of others.

September 27, 1988

MEMORANDUM OPINION FOR THE COUNSEL TO THE PRESIDENT

## Introduction and Summary

This memorandum responds to your request for an opinion on the application of section 504 of the Rehabilitation Act of 1973 ("Act"), 29 U.S.C. § 794, to individuals who are infected with the Human Immunodeficiency Virus ("HIV" or "AIDS virus"). You specifically asked us to consider this subject in light of *School Board of Nassau County v. Arline*, 480 U.S. 273 (1987). Congress has also sought to clarify the law in this area by amending the Rehabilitation Act to address directly the situation of contagious diseases and infections in the employment context. *See* Civil Rights Restoration Act of 1987, Pub. L. No. 100–259, § 9, 102 Stat. 28, 31 (1988) ("Civil Rights Restoration Act"). Although your opinion request was limited to the application of section 504 in the employment context, we have also considered the non-employment context because the President has directed the Department of Justice to review all existing federal anti-discrimination law applicable in the HIV infection context and to make recommendations with respect to possible new legislation.[1] *See* Memorandum for the Attorney General from President Ronald Reagan, 24 Weekly Comp. Pres. Doc. 1007 (Aug. 5, 1988).

---

[1] We defer to others in the Department to make the policy determinations necessary to recommend legislation, and, in keeping with the tradition of this Office, confine our analysis to matters of legal interpretation.

For the reasons stated below, we have concluded, with respect to the non-employment context, that section 504 protects symptomatic and asymptomatic HIV-infected individuals[2] against discrimination in any covered program or activity on the basis of any actual, past or perceived effect of HIV infection that substantially limits any major life activity[3]—so long as the HIV-infected individual is "otherwise qualified" to participate in the program or activity, as determined under the "otherwise qualified" standard set forth in *Arline*. We have further concluded that section 504 is similarly applicable in the employment context, except for the fact that the Civil Rights Restoration Act replaced the *Arline* "otherwise qualified" standard with a slightly different statutory formulation. We believe this formulation leads to a result substantively identical to that reached in the non-employment context: namely, that an HIV-infected individual is only protected against discrimination if he or she is able to perform the duties of the job and does not constitute a direct threat to the health or safety of others.[4]

*I. Statutory Framework Under Section 504*

Section 504 was intended to proscribe discrimination against the handicapped in programs or activities that are conducted by federal agencies or that receive federal funds. In relevant part, the statute provides:

> No otherwise qualified individual with handicaps in the United States, as defined in section 706(8) of this title, shall, solely by reason of his handicap, be excluded from the participation in, be

---

[2] In this opinion, individuals who are infected with the AIDS virus and have developed the clinical symptoms known as Acquired Immune Deficiency Syndrome ("AIDS") or AIDS-Related Complex ("ARC") will sometimes be referred to as "symptomatic HIV-infected individuals." Individuals who are infected with the AIDS virus but do not have AIDS or ARC will sometimes be referred to as "asymptomatic HIV-infected individuals." References to AIDS should be understood to include ARC, except where a distinction between the two is expressly drawn. Finally, where we intend to refer to all HIV-infected individuals, whether symptomatic or not, we either refer to "HIV-infected individuals" or to "HIV infection" (without any "symptomatic" or "asymptomatic" modifier) or clearly indicate in the text that the discussion refers to both categories.

[3] The medical information available to us indicates that HIV infection is a physical impairment which in a given case may substantially limit a person's major life activities. *See* infra pp. 213–17. In addition, others may regard an HIV-infected person as being so impaired. *See* infra pp 217–18. Either element in a given case, we believe, would be sufficient for a court to conclude that an HIV-infected person is an "individual with handicaps" within the terms of the Act. By virtue of the fact that the handicap here, HIV infection, gives rise both to disabling physical symptoms and to contagiousness, it is unnecessary to resolve with respect to any other infection or condition which gives rise to contagiousness alone whether that singular fact could render a person handicapped. In other words, the medical information available to us undermines the accuracy of the assumption or contention referenced in *Arline* that carriers of the AIDS virus are without physical impairment. 480 U.S. at 282 n.7.

[4] These conclusions differ from, and supersede to the extent of the difference, a June 20, 1986 opinion from Charles J. Cooper, Assistant Attorney General, Office of Legal Counsel, for Ronald E. Robertson, General Counsel, Department of Health and Human Services ("Cooper Opinion"). The conclusions herein incorporate subsequent legal developments (the Supreme Court's decision in *Arline* and Congress' passage of the Civil Rights Restoration Act) and subsequent medical clarification (*see* July 29, 1988 letter from C Everett Koop, M.D., Surgeon General, to Douglas W. Kmiec, Acting Assistant Attorney General, Office of Legal Counsel ("Koop Letter") (attached).

denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.

29 U.S.C. § 794.[5]

There are two definitions of "individual with handicaps," one or both of which may be applicable to HIV-infected individuals depending upon the context in which the discrimination occurs. The generally-applicable definition is "any person who (i) has a physical or mental impairment which substantially limits one or more of such person's major life activities, (ii) has a record of such an impairment, or (iii) is regarded as having such an impairment." 29 U.S.C. § 706(8)(B). Thus, an individual can qualify as handicapped under the general definition if he actually suffers from a disabling impairment, has recovered from a previous such condition, was previously misclassified as having such a condition, or is regarded as having such a condition, whether or not he actually has it. The Civil Rights Restoration Act amended the definitions section of the Rehabilitation Act to provide, in the employment context, a qualification of the definition of an "individual with handicaps" with respect to contagious diseases and infections. This provision qualifies rather than supplants the general definition of "individual with handicaps".[6] The amendment provides as follows:

For the purpose of sections 503 and 504, as such sections relate to employment, [the term "individual with handicaps"] does not include an individual who has a currently contagious disease or infection and who, by reason of such disease or infection, would constitute a direct threat to the health or safety of other individu-

---

[5] Section 504 thus has five elements First, an individual claiming discriminatory treatment must be an "individual with handicaps," as defined in the Act. Second, the individual must be "otherwise qualified" for the benefit or program participation being sought Third, the individual must be excluded from participation in, be denied the benefits of, or otherwise be subjected to discrimination under a covered program or activity. Fourth, the contested treatment must be "solely by reason of . . handicap." And fifth, the discrimination must occur in a program or activity conducted or funded by the federal government.

The definition of "program or activity" is set forth in a new section 504(b), which was added by section 4 of the Civil Rights Restoration Act. In general, the term is to be given an institution-wide scope rather than the program- or activity-specific scope called for by *Grove City College v Bell*, 465 U.S. 555 (1984). *Grove City* was superseded by the Civil Rights Restoration Act *See* Pub L. No 100–259, § 2, 102 Stat. 28.

[6] The Civil Rights Restoration Act amended 29 U.S.C. § 706(8) to add the qualification as a new subparagraph (C), to follow subparagraph (B), which contains the generally-applicable definition of "individual with handicaps." The new subparagraph thus constitutes a specific qualification of the preceding general definition. The qualification operates in the same way as the qualification Congress enacted in 1978 with respect to alcohol and drug abuse, on which the contagious disease provision was modeled. *See infra* note 19 and accompanying text. Both provisions are structured as exclusions from the general definition. The natural implication of both statutory exclusions is that persons who do not fall within the specified grounds for exclusion are covered by section 504 to the extent that they meet the general requirements of that section.

als or who, by reason of the currently contagious disease or infection, is unable to perform the duties of the job.

Pub. L. No. 100–259, § 9, 102 Stat. 28, 31–32 (1988).

## II. Application of Section 504 in Contexts Other Than Employment

Section 504, as interpreted by the Supreme Court in *Arline*, has two primary elements: the definition of "individual with handicaps" and the "otherwise qualified" requirement. We will first determine whether in the non-employment context an HIV-infected individual, whether symptomatic or asymptomatic, is an "individual with handicaps," and then discuss the application of the "otherwise qualified" requirement to such an individual.[7]

### A. Symptomatic HIV-Infected Individuals

As discussed below, *Arline* requires the conclusion that persons with AIDS (*i.e.*, *symptomatic* HIV-infected individuals) are within the section 504 definition of handicapped individual notwithstanding their contagiousness. Contagiousness, by itself, does not obviate the existence of a handicap for purposes of section 504. *Arline*, 480 U.S. at 282.

*Arline* involved an elementary school teacher who had been discharged after suffering a third relapse of tuberculosis within two years. All parties conceded, and the Court found, that the plaintiff was handicapped because her tuberculosis had adversely affected her respiratory system, requiring hospitalization. *Id.* at 281. Plaintiff's respiratory ailment thus was a physical impairment that substantially limited one of her major life activities. *Id.* The Court concluded that the defendant's action came within the coverage of section 504, notwithstanding the fact that Ms. Arline was dismissed not because of any disabling effects of her tuberculosis but because of her employer's fear that her contagiousness threatened the health of her students. The Court concluded that "the fact that a person with a record of physical impairment is also contagious does not suffice to *remove* that person from coverage under § 504." *Id.* at 285–86 (emphasis added).

We believe that symptomatic HIV-infected individuals are handicapped under section 504. For these individuals, the disease has progressed to the point where the immune system has been sufficiently weakened that a disease such as cancer

---

[7] *Arline* was also concerned with a third element: namely, whether the contagiousness of a handicapped individual covered by the Act could be used as a justification for discrimination against that individual. Subject to the "otherwise qualified" limitation, the Court held that contagiousness cannot be used for this purpose. The Court stated: "We do not agree with petitioners that, in defining a handicapped individual under § 504, the contagious effects of a disease can be meaningfully distinguished from the disease's physical effects on a claimant. . . . It would be unfair to allow an employer to seize upon the distinction between the effects of a disease on others and the effects of a disease on a patient and use that distinction to justify discriminatory treatment." *Arline*, 480 U.S. at 282. In light of the Court's holding, we conclude that the contagiousness of an HIV-infected individual cannot be relied upon to remove that individual from the coverage of the Act. *Contra* Cooper Opinion at 27 & n.70.

or pneumonia has developed, and as a result, the individual is diagnosed as having clinical AIDS. Because of the substantial limiting effects these clinical symptoms have on major life activities, such a person is an "individual with handicaps" for purposes of section 504. This same conclusion should also apply to a person with ARC, who also has serious disabling physical effects caused by HIV infection, although the physical symptoms are not the particular diseases that the Centers for Disease Control have included in its list of the clinical symptoms that constitute AIDS. As with the tuberculosis that afflicted Ms. Arline, AIDS (or ARC) is often "serious enough to require hospitalization, a fact more than sufficient [in itself] to establish that one or more . . . major life activities [are] substantially limited." *Id.* at 281. Therefore, assuming they are otherwise qualified, contagiousness does not excuse or justify discrimination against individuals handicapped by symptomatic HIV infection. As will be seen, the consideration of the "otherwise qualified" standard allows for a reasonable determination of whether contagiousness threatens the health or safety of others or job performance, and in those events, permits the exclusion of the individual from the covered program or activity.

## B. Asymptomatic HIV-Infected Individuals

*Arline* did not resolve the application of section 504 to *asymptomatic* HIV-infected individuals.[8] The Court left open the question of whether such individuals are "individuals with handicaps" under section 504, a question which turns on whether an asymptomatic HIV-infected individual "(i) has a physical or mental impairment which substantially limits one or more of such person's major life activities, (ii) has a record of such impairment, or (iii) is regarded as having such an impairment." 29 U.S.C. § 706(8)(B). These determinations primarily focus upon: (1) whether HIV infection by itself is a physical or mental impairment; and (2) whether the impairment substantially limits a major life activity (*i.e.*, whether it has a disabling effect); or (3) whether someone with HIV infection could be regarded as having an impairment which substantially limits a major life activity.

---

[8] Since the plaintiff had disabling physical symptoms and thus was clearly a handicapped individual under section 504, the Court declined to reach the question of whether a person without such an impairment could be considered handicapped by virtue of a communicable disease alone As the Court stated, "[t]his case does not present, and we therefore do not reach, the questions whether a carrier of a contagious disease such as AIDS [who suffers no physical impairment] could be considered to have a physical impairment, or whether such a person could be considered, solely on the basis of contagiousness, a handicapped person as defined by the Act " *Id.* at 282 n.7 Subsequent to *Arline*, the Surgeon General informed this Office that even an asymptomatic HIV-infected individual is physically impaired, stating that "from a purely scientific perspective, persons with HIV infection are clearly impaired. They are not comparable to an immune carrier of a contagious disease such as Hepatitis B." Koop Letter at 2. In light of Dr Koop's letter, this Office has no occasion to determine whether a contagious, but not impaired individual, such as a Hepatitis B carrier, would be protected by the Act. *See supra* note 3. *Cf Kohl by Kohl v. Woodhaven Learning Ctr.*, 672 F Supp. 1226, 1236 (W.D Mo 1987) (finding a Hepatitis B carrier to be within the Act).

### 1. *Asymptomatic HIV-Infected Individuals Are Physically Impaired*

The Department of Health and Human Services regulations implementing section 504 define "physical impairment" as:

> [A]ny physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological; musculoskeletal; special sense organs; respiratory, including speech organs; cardiovascular; reproductive, digestive, genito-urinary; hemic and lymphatic; skin; and endocrine.

45 C.F.R. § 84.3(j)(2)(i) (1987). In addition, an appendix to the regulations provides an illustrative (but not exhaustive) list of diseases and conditions that are "physical impairments" for purposes of section 504: "such diseases and conditions as orthopedic, visual, speech, and hearing impairments, cerebral palsy, epilepsy, muscular dystrophy, multiple sclerosis, cancer, heart disease, diabetes, mental retardation, [and] emotional illness, and . . . drug addiction and alcoholism." 45 C.F.R. pt. 84, app. A, p. 344 (1987).

The first question is whether an asymptomatic HIV-infected individual is physically impaired for purposes of section 504. For this factual determination we necessarily must rely heavily on the views of the Public Health Service of the United States. In this respect, Dr. C. Everett Koop, the Surgeon General of the Public Health Service, has indicated that it is

> inappropriate to think of [HIV infection] as composed of discrete conditions such as ARC or "full blown" AIDS. HIV infection is the starting point of a single disease which progresses through a variable range of stages. In addition to an acute flu-like illness, early stages of the disease may involve subclinical manifestations *i.e.*, impairments and no visible signs of illness. The overwhelming majority of infected persons exhibit detectable abnormalities of the immune system.

Koop Letter at 1–2. On the basis of these facts, the Surgeon General concluded that

> from a purely scientific perspective, persons with HIV infection are clearly impaired. They are not comparable to an immune carrier of a contagious disease such as Hepatitis B. Like a person in the early stages of cancer, they may appear outwardly healthy but are in fact seriously ill.

*Id.* at 2.

In our view, the type of impairment described in the Surgeon General's letter fits the HHS definition of "physical impairment" because it is a "physiological

disorder or condition" affecting the "hemic and lymphatic" systems.[9] We therefore believe that, in light of the Surgeon General's medical assessment, asymptomatic HIV-infected individuals, like their symptomatic counterparts, have a physical impairment.

## 2. Asymptomatic HIV-Infected Individuals and Limits on Major Life Activities

The second question, therefore, is whether the physical impairment of HIV infection substantially limits any major life activities.

Under the HHS regulations implementing section 504, "'major life activities' means functions *such as* caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 45 C.F.R. § 84.3(j)(2)(ii) (1987) (emphasis added). Although the definition is illustrative and not exhaustive, it does provide a helpful starting point for our analysis. We would expect that courts will resolve the factual question of whether the impairment of HIV infection limits a major life activity by reviewing this list for guidance in ascertaining whether a particular activity constitutes a basic function of life comparable to those on the list.

As indicated earlier, the disabling effects of HIV infection are readily apparent in the case of symptomatic HIV infection. The salient point with respect to symptomatic HIV-infected individuals is not that they have AIDS or ARC but rather that their impairment has manifest disabling effects. Again, as noted above, we believe that the courts will find that such individuals are limited in a number of major activities. Due to the weakness of their immune system and depending on the nature of the particular disease afflicting symptomatic HIV-infected individuals, any and perhaps all of the life activities listed in the HHS regulations could be substantially limited.

The question with respect to asymptomatic HIV-infected individuals is more difficult because such individuals would not appear at first glance to have disabling physical effects from their infection that substantially affect the type of life activities listed in the HHS regulations. Their ability, for example, to work,

---

[9] Moreover, it would also appear that the impairment affects the brain and central nervous system as well Medical evidence indicates that the AIDS virus, apart from any effect it has on the immune system, also attacks the central nervous system and may result in some form of mental deficiency or brain dysfunction in a significant percentage of persons infected with the virus. "Mental disease (dementia) will occur in some patients who have the AIDS virus *before* they have any other manifestation such as ARC or classic AIDS." U.S. Department of Health Services, *Surgeon General's Report on Acquired Immune Deficiency Syndrome* 32 (1986) ("*Surgeon General's Report*") *See also id.* at 12 ("The AIDS virus may also attack the nervous system and cause delayed damage to the brain. This damage may take years to develop and the symptoms may show up as memory loss, indifference, loss of coordination, partial paralysis, or mental disorder. These symptoms may occur alone, or with other symptoms mentioned earlier.").

In addition, as discussed below with respect to the effects of HIV infection on major life activities, infection with the virus affects the reproductive system because of the significant danger that the virus will be transmitted to a baby during pregnancy. Also bearing on whether HIV infection is a physical impairment under the HHS regulations is the Surgeon General's statement in his letter that HIV infection in its early stages is comparable to cancer— a disease that is listed in the HHS regulations as a physical impairment—in that infected individuals "may appear outwardly healthy but are in fact seriously ill." Koop Letter at 2.

215

to care for themselves, to perform manual tasks, or to use their senses are usually not directly affected.

Nevertheless, we believe it is likely that the courts will conclude that asymptomatic HIV-infected individuals have an impairment that substantially limits certain major life activities. While the Supreme Court explicitly refrained from answering this precise question in *Arline*, because HIV infection was not before it and perhaps in the mistaken understanding that asymptomatic HIV infection was not accompanied by an impairment,[10] the logic of the decision cannot fairly be said to lead to a different conclusion. This conclusion, we believe, may be based either on the effect that the knowledge of infection will have on the individual or the effect that knowledge of the infection will have on others. With respect to the latter basis, the Court observed, "[i]t would be unfair to allow an employer to seize upon the distinction between the effects of a disease on others and the effects of a disease on a patient and use that distinction to justify discriminatory treatment." *Arline*, 480 U.S. at 282.

### a. *Limitation of Life Activities Traceable to Knowledge of Infection by Asymptomatic HIV-Infected Individual*

Turning first to the effect knowledge of infection may have on the asymptomatic individual, it can certainly be argued that asymptomatic HIV infection does not directly affect any major life activity listed in the HHS regulations. 45 C.F.R. § 84.3(j)(2)(ii) (1987). However, since the regulatory list was not intended as an exhaustive one, we believe at least some courts would find a number of other equally important matters to be directly affected. Perhaps the most important such activities are procreation and intimate personal relations.

Based on the medical knowledge available to us, we believe that it is reasonable to conclude that the life activity of procreation—the fulfillment of the desire to conceive and bear healthy children—is substantially limited for an asymptomatic HIV-infected individual. In light of the significant risk that the AIDS virus may be transmitted to a baby during pregnancy,[11] HIV-infected individuals cannot, whether they are male or female, engage in the act of procreation with the normal expectation of bringing forth a healthy child. Because of the infection in their system, they will be unable to fulfill this basic human desire. There is little doubt that procreation is a major life activity and that the physical ability to engage in *normal* procreation—procreation free from the fear of what the infection will do to one's child—is substantially limited once an individual is infected with the AIDS virus.

This limitation—the physical inability to bear healthy children—is separate and apart from the fact that asymptomatic HIV-infected individuals will choose not to attempt procreation. The secondary decision to forego having children is

---

[10] *Compare Arline*, 480 U S. at 282 n.7 (suggesting that HIV infection is a disease without physical impairment) *with* Koop Letter at 2 (HIV infection is a physical impairment)

[11] *Surgeon General's Report* at 20–21 ("Approximately one third of the babies born to AIDS-infected mothers will also be infected with the AIDS virus.").

just one of many major life decisions that we assume infected individuals will make differently as a result of their awareness of their infection. Similarly, some courts can be expected to find a limitation of a major life activity in the fact that an asymptomatic HIV-infected individual's intimate relations are also likely to be affected by HIV infection. The life activity of engaging in sexual relations is threatened and probably substantially limited by the contagiousness of the virus.[12]

Finding limitations of life activities on the basis of the asymptomatic individual's responses to the knowledge of infection might be assailed as not fully persuasive since it depends upon the conscience and good sense of the person infected. The causal nexus, it would be argued, is not between the physical effect of the infection (as specified in the Koop Letter) and life activities, but between the conscience or normative judgment of the particular infected person and life activities. Thus, it might be asserted that there is nothing inherent in the infection which actually prevents either procreation or intimate relations.[13]

It is undoubtedly true that some HIV-infected individuals have not or will not change their behavior after learning they are infected, thereby exhibiting disregard for the health of their offspring or sexual partners. Nonetheless, in any case where the evidence indicates that the plaintiff HIV-infected individual has in fact changed his or her behavior—as, for example, where the plaintiff represents that procreation has been foregone—the court might well find a limitation of major life activity. Moreover, courts may choose to pass over such factual questions since the Supreme Court has stated an alternative rationale for finding a life activity limitation based on the reaction of others to the infection. We turn to that rationale next.

### b. *Limitation of Life Activities Traceable to Reaction of Others to Asymptomatic HIV Infection*

The *Arline* Court relied on the express terms of the statute for the proposition that a handicapped individual includes someone who is regarded by others as having a limitation of major life activities whether they do or not. 29 U.S.C. § 706(8)(B)(iii). This provision was added by Congress in 1974. The Court cited the legislative history accompanying this textual expansion to show that an impaired person could be protected even if the impairment "in fact does not substantially limit that person's functioning," S. Rep. No. 1297, 93d Cong., 2d Sess. 64 (1974), and observed that such an impairment "could nevertheless substantially limit that person's ability to work as a result of the negative reactions of others to the impairment." 480 U.S. at 283.

This construction by the Court of the statutory definition of the term "handicapped individual" has particular significance for the application of section 504 to asymptomatic HIV-infected individuals. The Court found that in order "[t]o combat the effects of erroneous but nevertheless prevalent perceptions about the

---

[12] *Id* at 14–18.
[13] As indicated in the text, we think this argument is disingenuous at least insofar as infection physically precludes the normal procreation of healthy children.

handicapped," Congress intended by its 1974 amendment to expand the section's scope to include persons who are regarded as handicapped, but who "'may at present have no actual incapacity at all.'" *Id.* at 279 (quoting *Southeastern Community College v. Davis,* 442 U.S. 397, 405–06 n.6 (1979)). Stressing this point, the Court repeated later in the opinion that the amended definition covers persons "who, as a result [of being incorrectly regarded as handicapped], are substantially limited in a major life activity." *Id.* at 284. The effect of this interpretation is that the perceived impairment need not directly result in a limitation of a major life activity, so long as it has the indirect effect, due to the misperceptions of others, of limiting a life activity (in *Arline,* the activity of working).[14] Thus, at least one district court following *Arline* has held that if an individual or organization limits an HIV-infected individual's participation in a section 504 covered activity because of fear of contagion, a major life activity of the individual is substantially limited.[15]

### C. Application of the "Otherwise Qualified" Requirement

The Supreme Court's opinion in *Arline* concluded by remanding the case for consideration by the district court of whether the plaintiff was "otherwise qualified." The Court indicated more generally that section 504 cases involving persons with contagious diseases should turn on the "otherwise qualified" issue, that such individuals must "have the opportunity to have their condition evaluated in light of medical evidence and a determination made as to whether they were 'otherwise qualified.'" 480 U.S. at 285. The Court stressed that before making this determination the trial court must

---

[14] The *Arline* Court appears not to accept the distinction between being perceived as having an impairment that itself limits a major life activity (the literal meaning of the statutory language) and having a condition the misperception of which results in limitation of a life activity. This may have been the distinction the Solicitor General was attempting to draw by suggesting there was a difference between being perceived as having a handicap that precludes work and being perceived as contagious, which does not physically preclude work, except that because of the perception, no work is offered. As recited by the Court, the Solicitor General stated at oral argument "that to argue that a condition that impaired *only* the ability to work was a handicapping condition was to make 'a totally circular argument which lifts itself by its bootstraps ' The argument is not circular, however, but direct. Congress plainly intended the Act to cover persons with a physical or mental impairment (whether actual, past, or perceived) that substantially limited one's ability to work." *Id* at 283 n.10 (citation omitted). This last statement, of course, returned the Court to the statute's literal meaning. The only justification for departing from that meaning occurs not in footnote 10 of *Arline,* but in footnote 9, where the Court relied on legislative history which does indicate that at least some members of Congress believed that the perception of a physical disability by others does not have to include the belief that the perceived condition results in a limitation of major life activities, but simply that the perception of the condition by others in itself has that effect. *Id.* at 282–83 n.9 (physically repulsive aspects of cerebral palsy, arthritis, and facial deformities).

[15] *Doe v Centinela Hosp.,* Civ 87–2514 (C.D. Cal. June 30, 1988) (holding HIV-infected individual to be "individual with handicaps" because he was perceived as such by the defendant). The district court wrote that a person is an individual with handicaps if he "has a physiological disorder or condition affecting a body system that substantially limits a 'function' only as a result of the attitudes of others toward the disorder or condition." Slip op at 12 The HHS regulations are in accord with this view 45 C.F R. § 84.3(j)(2)(iv)(B) (1987). Although as indicated in the previous footnote we think this aspect of the Supreme Court's reasoning departs from the literal meaning of the statutory text in favor of legislative history, we do not question that the district court in *Centinela Hospital* fairly reads *Arline* to support a finding that the reaction of others to the contagiousness of an HIV-infected individual in itself may constitute a limitation on a major life activity.

conduct an individualized inquiry and make appropriate findings of fact. Such an inquiry is essential if § 504 is to achieve its goal of protecting handicapped individuals from deprivations based on prejudice, stereotypes, or unfounded fear, while giving appropriate weight to such legitimate concerns of grantees as avoiding exposing others to significant health and safety risks . . . . In the context of the employment of a person handicapped with a contagious disease . . . this inquiry should include "[findings of] facts, based on reasonable medical judgments given the state of medical knowledge, about (a) the nature of the risk (how the disease is transmitted), (b) the duration of the risk (how long is the carrier infectious), (c) the severity of the risk (what is the potential harm to third parties) and (d) the probabilities the disease will be transmitted and will cause varying degrees of harm." Brief for American Medical Association as *Amicus Curiae* 19. In making these findings, courts normally should defer to the reasonable medical judgments of public health officials. The next step in the "otherwise-qualified" inquiry is for the court to evaluate, in light of these medical findings, whether the employer could reasonably accommodate the employee under the established standards for that inquiry.

*Id.* at 287–88 (footnotes omitted).

It is important to emphasize that the Court recognized that "[a] person who poses a significant risk of communicating an infectious disease to others in the workplace will not be otherwise qualified for his or her job if reasonable accommodation will not eliminate that risk." *Id.* at 288 n.16. The Court has thus made it clear that persons infected with the AIDS virus will not be "otherwise qualified" to perform jobs that involve a significant risk of transmitting the virus to others. In addition, an "otherwise qualified person is one who is able to meet all of a program's requirements in spite of his handicap." *Southeastern Community College v. Davis*, 442 U.S. 397, 406 (1979).[16]

Based on current medical knowledge, it would seem that in most situations the probability that the AIDS virus will be transmitted is slight, and therefore as a matter of health and safety there will often be little, if any, justification for treating infected individuals differently from others.[17] Similarly, mere HIV infection involving only "subclinical manifestations" will generally also not render an individual unqualified to participate in a covered program or activity on the basis of inability to perform. As the disease progresses, however, and conditions such as ARC or "full blown" AIDS affect the physical or mental capacity of the indi-

---

[16] In ascertaining whether a person is otherwise qualified, the court considers "whether any 'reasonable accommodation' by the employer would enable the handicapped person to perform those functions. Accommodation is not reasonable if it either imposes 'undue financial and administrative burdens' on a grantee, . . . , or requires 'a fundamental alteration in the nature of [the] program.'" 480 U.S. at 287 n 17 (citations omitted).

[17] *See Surgeon General's Report* at 13 ("No Risk from Casual Contact").

vidual, it may well be that an "individualized inquiry" will reveal that such person is not otherwise qualified to participate.

In addition, current medical knowledge does suggest the possibility of specialized contexts where, even with respect to a person in the early stages of the disease, a court might find an individual to be not otherwise qualified. These situations are very likely to involve individuals who have responsibility for health or safety, such as health care professionals or air traffic controllers. In these and similar situations where there is a greater possibility that the AIDS virus could be transmitted *see generally Surgeon General's Report*, or the consequences of a dementia attack could be especially dangerous, *see supra* note 9, we believe a court could find, within the scope of "otherwise qualified" standard, a justification for treating HIV-infected individuals differently from uninfected individuals.

In brief, whether HIV-infected individuals will be found after the individualized inquiry required by *Arline* to be otherwise qualified will often depend on how far the disease has progressed. At the early stages of the disease, it is likely that neither health and safety nor performance will provide a justification for excluding an HIV-infected person. Moreover, while current medical knowledge suggests that safety should not be a concern in most contexts even as the disease progresses, an individualized assessment of performance may result in those with AIDS or ARC being found not otherwise qualified. Finally, courts may find in certain specialized contexts that an HIV-infected individual is not otherwise qualified at any stage of the disease because infection in itself presents an especially serious health or safety risk to others because of the nature of the position. The inquiry in each case will be a factual one, and because of that, we are unable to speculate further.

III. *Application of Section 504 in the Employment Context*

A. *Introduction and Summary*

The Civil Rights Restoration Act included a provision, the Harkin-Humphrey amendment,[18] which amended the definitions section of the Rehabilitation Act to provide, with respect to employment, a specific qualification of the definition of an "individual with handicaps" in the context of contagious diseases and infections:

> For the purpose of sections 503 and 504, as such sections relate
> to employment, [the term "individual with handicaps"] does not
> include an individual who has a currently contagious disease or
> infection and who, by reason of such disease or infection, would
> constitute a direct threat to the health or safety of other individu-

---

[18] Pub. L. No. 100–259, § 9, 102 Stat. 28, 31–32 (1988). Since this amendment to section 504 was jointly sponsored by Senators Harkin and Humphrey, we will refer to the amendment in this opinion as "Harkin-Humphrey."

als or who, by reason of the currently contagious disease or in-
fection, is unable to perform the duties of the job.

As discussed below, application of the Harkin-Humphrey amendment in the
employment context should result in substantially the same conclusions as result
from application in the non-employment context of section 504 as interpreted in
*Arline.* Specifically, we conclude that Harkin-Humphrey provides that HIV-in-
fected individuals (regardless of whether or not they are symptomatic) are pro-
tected against discrimination in the employment context so long as they fall within
the general section 504 requirements defining an "individual with handicaps" and
do not contravene the specific qualification to the general requirements that the
amendment provides: namely, that they do not "constitute a direct threat to the
health or safety of other individuals" and they can "perform the duties of the job."
In our judgment, this qualification merely codifies the "otherwise qualified" stan-
dard discussed by the Court in *Arline* and discussed above in this memorandum,
including the provision of a means of reasonable accommodation that can elim-
inate the health or safety threat or enable the employee to perform the duties of
the job, if it is provided for under the employer's existing personnel policies and
does not impose an undue financial or administrative burden.

Because Harkin-Humphrey was a floor amendment that was not developed by
a committee, there is no committee report explaining it. The only explanatory
statement that accompanied its introduction was a one-sentence statement of pur-
pose—"Purpose: To provide a clarification for otherwise qualified individuals
with handicaps in the employment context", 134 Cong. Rec. 383 (1988)—and a
brief colloquy between the two sponsors. *Id.* at 383–84.

The sponsors' colloquy made three basic points. First, the amendment was de-
signed to do in the contagious disease and infection context what the compara-
bly phrased 1978 amendment to section 504 did in the context of alcohol and
drug abuse[19]—"assure employers that they are not required to retain or hire in-
dividuals with a contagious disease or infection when such individuals pose a di-
rect threat to the health or safety of other individuals, or cannot perform the es-
sential duties of a job." *Id.* at 384. Second, the amendment "does nothing to change
the current laws regarding reasonable accommodation as it applies to individu-
als with handicaps." *Id.* Finally, "as we stated in 1978 with respect to alcohol and
drug abusers, . . . the two-step process in section 504 applies in the situation un-
der which it was first determined that a person was handicapped and then it is de-
termined that a person is otherwise qualified." *Id.* With that description of Harkin-
Humphrey's principal legislative history as background, we now discuss the
amendment's impact on two aspects of the application of section 504 to HIV in-
fection cases in the employment context: (1) whether section 504 applies to both

---

[19] "For purposes of sections 503 and 504 as such sections relate to employment, [the term "handicapped indi-
vidual"] does not include any individual who is an alcoholic or drug abuser whose current use of alcohol or drugs
prevents such individual from performing the duties of the job in question or whose employment, by reason of such
current alcohol or drug abuse, would constitute a direct threat to property or the safety of others." Pub. L. No.
95–602, § 122(a), 92 Stat. 2955, 2985 (1978) (codified at 29 U.S.C. § 706(8)(B)).

asymptomatic and symptomatic HIV-infected individuals; and (2) the manner in which the section's "otherwise qualified" requirement is to be applied, including whether employers must provide "reasonable accommodation" to infected individuals.

## B. Coverage of All HIV-Infected Individuals (Subject to the Stated Limitations)

We have no difficulty concluding that the Harkin-Humphrey amendment, and thus section 504 in the employment context, includes within its coverage both asymptomatic and symptomatic HIV-infected individuals. The amendment's language draws no distinction between asymptomatic and symptomatic individuals and, notably, applies to a "contagious disease or infection." It therefore applies to all HIV-infected individuals, whether or not they are symptomatic. It is true that the amendment is phrased in the negative in that it says who is not handicapped, rather than defining who is handicapped. Nevertheless, we believe the natural implication of this statutory exclusion is that persons who do not fall within the specified grounds for exclusion are covered by section 504 to the extent that they meet the general requirements of that section. Accordingly, in light of our previous discussion of the application of the general provisions of section 504 to HIV-infected persons, we conclude that all HIV-infected individuals who are not a direct threat to the health or safety of others and are able to perform the duties of their job are covered by section 504.

Harkin-Humphrey's legislative history reinforces this reading of the amendment.[20] There was no disagreement expressed concerning the amendment's applicability to asymptomatic HIV-infected individuals, and a number of legislators expressly stated that such persons were covered. Senator Harkin described the purpose of the amendment in a letter, dated February 26, 1988, to Representatives Hawkins and Edwards. Senator Harkin explained:

> The objective of the amendment is to expressly state in the statute the current standards of section 504 so as to reassure employers that they are *not* required to hire or retain individuals with contagious diseases or infections who pose a direct threat to the health or safety of others or who cannot perform the duties of a job.

> The basic manner in which an individual with a contagious disease or infection can present a direct threat to the health or safety of others is when the individual poses a significant risk of transmitting the contagious disease or infection to other individuals.

---

[20] Moreover, the model for the Harkin-Humphrey amendment—the 1978 amendment to section 504 concerning drug addicts and alcoholics—was intended to include within section 504 those covered persons not possessing the deficiencies identified in the statute. *See generally* 124 Cong. Rec. 30,322–25 (1978) (statements of Senators Cannon, Williams, and Hathaway).

The Supreme Court in *Arline* explicitly recognized this necessary limitation in the protections of section 504. The amendment is consistent with this standard.

134 Cong. Rec. 4781 (1988).[21]

During the subsequent debate in the House of Representatives, the Representatives who commented on the amendment indicated their understanding that persons with contagious diseases or *infections* were covered. For example, referring to the dissenting opinion in *Arline, see* 480 U.S. at 289–93, Representative Weiss observed:

> [Chief] Justice Rehnquist stated that Congress should have stated explicitly that individuals with contagious diseases were intended to be covered under section 504. Congress has done so now with this amendment, stating clearly that individuals with contagious diseases or infections are protected under the statute as long as they meet the "otherwise qualified" standard. This clarity is particularly important with regard to infections because individuals who are suffering from a contagious infection—such as carriers of the AIDS virus or carriers of the hepatitis B virus—can also be discriminated against on the basis of their infection and are also individuals with handicaps under the statute.

134 Cong. Rec. 2937 (1988). Representative Coelho stated that the amendment

> provides that individuals with contagious diseases or infections are protected under the statute unless they pose a direct threat to the health or safety of others or cannot perform the duties of the job.
>
> . . .
>
> People with contagious diseases and infections, such as people with AIDS or people infected with the AIDS virus, can be subject to intense and irrational discrimination. I am pleased that this amendment makes clear that such individuals are covered under the protections of the Rehabilitation Act.

*Id.* at 2924. Representative Owens commented:

> I am glad to see that [the amendment] refers to individuals with contagious infections, thus clarifying that such infections can constitute a handicapping condition under the Act.

---

[21] *See also* 134 Cong. Rec. 2860 (1988) ("The purpose of the amendment was to clarify for employers the applicability of section 504 of the Rehabilitation Act of 1973 to persons who have a currently contagious disease or infection.") (statement of Sen. Harkin).

*Id.* at 2937. The record is replete with similar comments.[22]

In summary, we believe that under the Harkin-Humphrey amendment, section 504 applies in the employment context to all HIV-infected individuals, which necessarily includes both asymptomatic and symptomatic HIV-infected individuals. This parallels our conclusions with respect to HIV-infected individuals, both symptomatic and asymptomatic, outside the employment context. The difference between the employment and non-employment contexts because of the Harkin-Humphrey amendment is thus more apparent than real. Specifically, it is our view that the Harkin-Humphrey amendment merely collapses the "otherwise qualified" inquiry applicable outside the employment context into the definition of "individual with handicaps" in the employment text. Thus, whether *outside the employment context* a particular infected person is deemed to be handicapped but ultimately receives no protection under the statute because that person poses a danger to others and is thereby not "otherwise qualified" or whether that same person is not deemed to be handicapped under the Harkin-Humphrey amendment *in the employment context* for the same reason is of only semantic significance. In either case, if the infection is a direct threat to the health or safety of others or renders the individual unable to perform the duties of the job, the grantee or employer is not required to include that person in the covered program or activity or retain or hire him in a job. Indeed, the legislative history suggests that the principal purpose of the Harkin-Humphrey amendment was the codification of the "otherwise qualified" limitation as discussed in *Arline*.[23]

## C. Is There a "Reasonable Accommodation" Requirement Under Harkin-Humphrey?

The Department of Health and Human Services ("HHS") regulations implementing section 504, first issued in 1977, reflect HHS' determination that a "reasonable accommodation" requirement is implicit in the "otherwise qualified" element of section 504. 42 Fed. Reg. 22,676, 22,678 (1977). Then, as now, the regulations provided the following statement of the "otherwise qualified" requirement: "'Qualified handicapped person' means . . . [w]ith respect to employment, a handicapped person who, *with reasonable accommodation*, can per-

---

[22] *See, e g*, 134 Cong. Rec. 2948 (1988) (statement of Rep. Edwards) ("I commend the Members of the Senate for fashioning this amendment in such a way that the courts will continue to adjudicate cases involving AIDS, HIV infection and other communicable conditions on a case by case basis "); *id* at 3044 (statement of Rep. Hoyer) (referring to "people with AIDS and people infected with the AIDS virus" as equally subject to the amendment); *id.* at 2943 (statement of Rep Dannemeyer) (opposing amendment because it covers "asymptomatic carriers").

[23] "Purpose. To provide a clarification for otherwise qualified individuals with handicaps in the employment context." 134 Cong. Rec. 383 (1988). *See also* the sponsors' colloquy, discussed *supra* in the text, as well as the comments of individual members *E g*, *id* at 2947 (statement of Rep Edwards) ("This amendment . . . codif[ies] the 'otherwise qualified' framework for courts to utilize in these cases."); *id.* at 2937 (statement of Rep. Weiss) ("In such circumstances [significant risk of communicating a contagious disease], the individual is not 'otherwise qualified' to remain in that particular position. The Supreme Court in *Arline* explicitly recognized this necessary limitation in the protections of section 504. The Senate amendment places that standard in statutory language . . ."), *id.* at 3043 (statement of Rep. Hoyer) ("[T]his amendment essentially codifies the existing standard of otherwise qualified in section 504, as explicated by the Supreme Court in *Arline* ").

224

form the essential functions of the job in question."[24] In *Arline*, the Supreme Court endorsed the "reasonable accommodation" requirement of the regulations, explaining that when a handicapped person is not able to perform the essential functions of the job, and is therefore not "otherwise qualified," "the court must also consider whether any 'reasonable accommodation' by the employer would enable the handicapped person to perform those functions."[25]

As noted above, the Harkin-Humphrey amendment includes within it the "otherwise qualified" standard. We must determine whether a "reasonable accommodation" requirement is implicit in Harkin-Humphrey's special section 504 formulation, just as HHS and the Supreme Court found such a requirement to be implicit in section 504 prior to this amendment. More specifically, was Harkin-Humphrey intended to require reasonable accommodation of a contagious individual who, absent such accommodation, poses a "direct threat to the health or safety of other individuals or . . . is unable to perform the duties of the job?" The amendment's legislative history convinces us that Congress intended that consideration of "reasonable accommodation" should be factored into an employer's determination of whether an infected employee poses a direct threat or can perform the job.

The legislative history of the Harkin-Humphrey amendment indicates that Congress was quite aware that administrative and judicial interpretation had added the "reasonable accommodation" gloss to section 504, and Congress understood and intended that such a gloss would be put on Harkin-Humphrey. The first evidence of this is found in the colloquy between Senators Harkin and Humphrey upon the introduction of the amendment. The colloquy stressed that the amendment "does nothing to change the current laws regarding reasonable accommodation as it applies to individuals with handicaps." 134 Cong. Rec. 384 (1988). More expansively, Senator Harkin subsequently stated:

> [T]he amendment does nothing to change the requirements in the regulations regarding providing reasonable accommodations for persons with handicaps, as such provisions apply to persons with contagious diseases and infections. Thus, if a reasonable accommodation would eliminate the existence of a direct threat to the health or safety of others or eliminate the inability of an individual with a contagious disease or infection to perform the essential duties of a job, the individual is qualified to remain in his or her position.

---

[24] 45 C.F.R. § 84.3(k)(1) (1987) (emphasis added). *See also* 45 C.F.R. § 84.12 (1987) (setting forth the "reasonable accommodation" requirements).

[25] *Arline*, 480 U.S. at 287 n.17  The Court suggested that two factors, originally employed by the Court in *Davis*, should be used to ascertain the reasonableness of an employer's refusal to accommodate a handicapped individual: "Accommodation is not reasonable if it either imposes 'undue financial and administrative burdens' on a grantee, *Southeastern Community College v. Davis*, 442 U.S. at 412, or requires a 'fundamental alteration in the nature of [the] program' *id*. at 410. *See* 45 C.F.R. § 84.12(c) (1985) (listing factors to consider in determining whether accommodation would cause undue hardship). .  " *Id*

*Id.* at 2861–62.

Senator Harkin's statement cannot be given dispositive weight because it was not joined by his co-sponsor, Senator Humphrey, and it was not made before the Senate voted on the amendment. However, Senator Humphrey never directly challenged this statement, or said that reasonable accommodation was not intended, and unchallenged statements to the same effect were made by members of the House speaking in favor of and against the amendment prior to the House vote on the amendment and by members of the Senate speaking in favor of and against the amendment prior to the vote to override the President's veto of the Civil Rights Restoration Act.

Prior to the House vote, for example, Representative Weiss remarked:

> As the Senate amendment now restates in statutory terms, [individuals with contagious diseases or infections] are also not otherwise qualified if, without reasonable accommodation, they would pose a direct threat to the health or safety of others or could not perform the essential functions of a job.

*Id.* at 2937. Representative Waxman said the same thing:

> [T]he Court went on to say [in *Arline*] that if [persons with contagious diseases] pose a significant risk of transmitting their diseases in the workplace, and if that risk cannot be eliminated by reasonable accommodation, then they cannot be considered to be "otherwise qualified" for the job. The amendment added by the Senate to this bill places that standard in law.

*Id.* at 2939 (emphasis added). Many other Representatives supporting the amendment agreed.[26] Opposing the amendment, Representative Dannemeyer stated that "[i]f this bill is passed as presently written, employers will be required to accommodate victims of this fatal disease despite potential health threats to other employees." *Id.* at 2943.

Prior to the Senate vote to override the President's veto of the Civil Rights Restoration Act, Senator Harkin reiterated his intent and understanding that reasonable accommodation was required:

---

[26] *E.g.,* 134 Cong. Rec 3280 (1988) (statement of Rep. Miller) ("[T]he new language added by the Senate changes nothing with respect to current law and is not intended to displace the . . . reasonable accommodations requirement under section 504."); *id* at 2947 (statement of Rep Edwards) ("The colloquy in the Senate between the two cosponsors of the amendment clarifies that it is the intent of Congress that the amendment result in no change in the substantive law with regard to assessing whether persons with this kind of handicapping condition are 'otherwise qualified' for the job in question or whether employers must provide 'reasonable accommodations' for such individuals."), *id.* at 2924 (statement of Rep. Coehlo) ("[I]ndividuals with contagious diseases and infections are not otherwise qualified—and thus are not protected in a particular position—if, without reasonable accommodation, they would pose a direct threat to the health or safety of others or cannot perform the duties of the job."), *id* at 3043–44 (statement of Rep. Hoyer) (not "otherwise qualified" if risk of communicating contagious disease "cannot be eliminated by reasonable accommodation"); *id* at 3935 (statement of Rep. Jeffords) (same); *id* at 2937 (statement of Rep. Owens) (same).

> I say to this body this bill does not I repeat does not require an employer to hire or retain in employment all persons with contagious diseases. An employer is free to refuse to hire or fire any employee who poses a direct threat to the health or safety of others who cannot perform the essential functions of the job *if no reasonable accommodation can remove the threat to the safety of others or enable the person to perform the essential functions of the job.* This determination must be made on an individualized basis and be based on facts and sound medical judgment.

*Id.* at 4272 (emphasis added). Moreover, in arguing that the President's veto should be sustained, a number of Senators stated their understanding that Harkin-Humphrey would require reasonable accommodation. Senator Hatch included in his list of objectionable features of the Civil Rights Restoration Act "the requirement to attempt to accommodate persons with infectious diseases, such as tuberculosis and AIDS." *Id.* at 4239. Senator Symms made the same point, arguing that "[t]he equality-of-result rather than equality-of-opportunity standards [in the Civil Rights Restoration Act] can lead to . . . the need to attempt to accommodate infectious persons." *Id.* at 4246.

Moreover, in addition to this direct evidence of congressional intent concerning the Harkin-Humphrey amendment, we also find illuminating the evidence that the 1978 drug and alcohol abuse amendment, on which Harkin-Humphrey is modeled,[27] was intended to require reasonable accommodation. During the Senate debate on Harkin-Humphrey, Senator Cranston observed that the drug and alcohol abuse amendment

> did not result in any basic change in the process under section 504 by which it is determined whether the individual claiming unlawful discrimination is handicapped and whether that individual is "otherwise qualified," *taking into account*—as in the case of all other handicapped persons—*any reasonable accommodations that should be made to enable him or her to perform the job satisfactorily.*

*Id.* at 1174 (emphasis added).

The legislative history of the drug and alcohol abuse amendment supports Senator Cranston's assertion that "reasonable accommodation" was required under that amendment. That legislative history is clear that the amendment was designed to codify the existing "otherwise qualified" standard, as interpreted by the Attorney General and the Secretary of HEW, which included the "reasonable accommodation" requirement.[28] In explaining the amendment, one of its sponsors specifically cited the "reasonable accommodation" requirement:

---

[27] *See sponsors' colloquy, 134 Cong. Rec. 383–84 (1988).*

[28] 43 Op. Att'y Gen. No 12, at 2 (1977) (section 504 does not "require unrealistic accommodations" for drug addicts or alcoholics); 42 Fed. Reg. 22,676, 22,678 (1977) (promulgating "otherwise qualified" definition, which is identical to current definition and thus includes reasonable accommodation).

227

Regulations implementing sections 503 and 504 already address [the concerns of employers and others seeking the amendment]. They make clear that the protections of sections 503 and 504 only apply to otherwise qualified individuals. That means . . . that distinction on the basis of qualification is perfectly justifiable. Regulations implementing section 503 define "qualified handicapped individual" as a handicapped person who is capable of performing a particular job *with reasonable accommodation to his or her handicap*.[29]

Our final reason for believing that Congress intended the Harkin-Humphrey amendment to preserve the "reasonable accommodation" requirement of existing law is that a contrary conclusion would entail overruling a specific holding of *Arline*. After holding that the plaintiff in *Arline* was a "handicapped individual," the Supreme Court remanded the case to the district court for the "otherwise qualified" determination, which the Court said should include "evaluat[ing], in light of [a series of medical findings], whether the employer could reasonably accommodate the employee under the established standards for that inquiry." 480 U.S. at 288.

Any reading of the Harkin-Humphrey amendment that precluded reasonable accommodation would be inconsistent with that *Arline* holding. Applying Harkin-Humphrey without reasonable accommodation to an individual like the plaintiff in *Arline* would probably result in a finding that the individual is a direct threat to the health and safety of her students without any meaningful consideration of non-burdensome ways to alleviate the danger. Thus, under that reading, an individual

---

[29] 124 Cong. Rec. 30,324 (1978) (statement of Sen Hathaway) (emphasis added). The sponsors of the amendment believed that it "simply [made] explicit what prior interpret[ations] of the act—including those of the Attorney General and the Secretary of Health, Education, and Welfare—have found." *Id* at 37,510 (statement of Sen. Williams). They did not believe that a change in law was necessary, but they were willing to provide a clarification in order to "reassure employers that it is not the intent of Congress to require any employer to hire a person who is not qualified for the position or who cannot perform competently in his or her job." *Id.* at 30,323. The amendment used an "otherwise qualified" formulation to clarify how existing law applied to drug and alcohol abusers. As explained by Senator Williams, "while the legislative history of the 1973 act, as authoritatively interpreted by the Attorney General, made clear that qualified individuals with conditions or histories of alcoholism or drug addiction were protected from discrimination by covered employers, this amendment codifies that intent." *Id.* at 37,509. Senator Williams' reference to the Attorney General was to an opinion Attorney General Bell provided to HEW Secretary Califano a month before HEW's promulgation (on May 4, 1977) of its regulations implementing section 504. 43 Op. Att'y Gen. No. 12 (Apr. 12, 1977). While concluding that drug and alcohol abusers were "handicapped individuals" subject to the same protections under section 504 as were all other handicapped individuals, the Attorney General stressed the applicability of the "otherwise qualified" requirement:

> [O]ur conclusion that alcoholics and drug addicts are "handicapped individuals" for purposes of section 504 does not mean that such a person must be hired or permitted to participate in a federally assisted program if the manifestations of his condition prevent him from effectively performing the job in question or from participating adequately in the program. A person's behavioral manifestations of a disability may also be such that his employment or participation would be unduly disruptive to others, and *section 504 presumably would not require unrealistic accommodations in such a situation*.

*Id* at 2 (emphasis added). As Senator Williams noted (124 Cong. Rec. 30,324 (1978)), Secretary Califano's statement accompanying issuance of the regulations agreed with the Attorney General's interpretation and his emphasis on the "otherwise qualified" requirement. 42 Fed. Reg 22,676, 22,686 (1977). The regulations issued by Secretary Califano included the "otherwise qualified" regulation requiring reasonable accommodation. *Id.* at 22,678.

with tuberculosis (or an HIV-infected individual) would receive less individualized scrutiny under the amendment than under *Arline*. However, it is clear that Congress did not intend to overrule *Arline*. Indeed, supporters of Harkin-Humphrey repeatedly and unequivocally spoke of codifying Arline and acting consistently with *Arline*, including specifically *Arline*'s approach to "otherwise qualified" and "reasonable accommodation."[30] Only a single statement by Senator Humphrey is arguably somewhat to the contrary, and even this remark does not undermine our conclusion, or the overwhelming evidence of legislative intent on which it is based.[31] Senator Humphrey merely stated that the amendment must result in some change or it would have been "pointless." However, codifying a Supreme Court holding in a manner designed to reassure those infected with a contagious disease of the law's protection and employers of the law's limits has a point.

For the foregoing reasons, we conclude that implicit in Harkin-Humphrey's statement of the "otherwise qualified" standard for the contagious disease context is a "reasonable accommodation" requirement.[32] Accordingly, before determining that an HIV-infected employee is not an "individual with handicaps," an employer must first consider whether, consistent with the employer's existing personnel policies for the job in question, a reasonable accommodation would eliminate the health or safety threat or enable the employee to perform the duties of the job.

*Arline*'s discussion of the HHS regulations' "reasonable accommodation" requirement presents a useful point of reference for considering what "reasonable accommodation" should be provided for HIV-infected individuals in the employment context. As noted by the Court, the HHS regulations provide that "[e]mployers have an affirmative obligation to make a reasonable accommodation for a handicapped employee. Although they are not required to find another job for an employee who is not qualified for the job he or she was doing, they cannot deny an employee alternative employment opportunities reasonably available under the employer's existing policies." 480 U.S. at 288 n.19. However, "where reasonable accommodation does not overcome the effects of a person's handicap, or where reasonable accommodation causes undue hardship to the employer, failure to hire or promote the handicapped person will not be considered discrimination." 45 C.F.R., pt. 84, app. A, p. 350 (1987).

While reasonable accommodation is part of the individualized factual inquiry and therefore difficult to discuss in the abstract, it clearly does not require al-

---

[30] *E g.*, 134 Cong. Rec. 4272 (1988) (statement of Sen. Harkin), *id* at 2860 (statement of Sen. Harkin, concurred in by Sen Kennedy and Sen Weicker), *id* at 1174 (statement of Sen Cranston), *id* at 2924 (statement of Rep. Coelho), *id* at 2931 (statement of Rep. Hawkins); *id.* at 3935 (statement of Rep Jeffords), *id* at 2937 (statement of Rep. Owens), *id* at 2939 (statement of Rep. Waxman); *id* at 2947 (statement of Rep. Edwards).

[31] 134 Cong. Rec. 1794 (1988) (statement of Sen. Humphrey) ("If the Humphrey-Harkin amendment had not resulted in some substantive change in the law, it would have been a pointless exercise. . . . [The amendment was not] intended merely to codify the status quo in this area The language of these measures is quite clear, and post facto interpretations should not be construed to alter their actual intent or effect ").

[32] The American Law Division of the Library of Congress' Congressional Research Service has reached the same conclusion. CRS Report for Congress, *Legal Implications of the Contagious Disease or Infectious Amendment to the Civil Rights Restoration Act, S 557* at 18–23 (March 14, 1988).

lowing an HIV-infected individual to continue in a position where the infection poses a threat to others. This would appear to be the case with infected health care workers who are involved in invasive surgical procedures, and it may also be the case with respect to other infected health care workers or individuals employed in jobs that entail responsibility for the safety of others. Limited accommodations might be required if alternative employment is reasonably available under the employer's existing policies. For example, a surgeon in a teaching hospital might be restricted to teaching or other medical duties that do not involve participation in invasive surgical procedures, or a policeman might be reassigned to duties that do not involve a significant risk of a physical injury that would involve bloodshed. In contrast, given the evolving and uncertain state of knowledge concerning the effects of the AIDS virus on the central nervous system, it may not be possible, at least if the disease has sufficiently progressed, to make reasonable accommodation for positions, such as bus driver, airline pilot, or air traffic controller, that may allow very little flexibility in possible job assignment and where the risk of injury is great if the employer guesses wrongly and the infected person is not able to perform the duties of the job.

## Conclusion

We have concluded, with respect to the non-employment context, that section 504 protects symptomatic and asymptomatic HIV-infected individuals against discrimination in any covered program or activity on the basis of any actual, past or perceived effect of HIV infection that substantially limits any major life activity—so long as the HIV-infected individual is "otherwise qualified" to participate in the program or activity, as determined under the "otherwise qualified" standard set forth in *Arline*. We have further concluded that section 504 applies in substance in the same way in the employment context, since the statutory qualification set forth in the Civil Rights Restoration Act merely incorporates the *Arline* "otherwise qualified" standard for those individuals who are handicapped under the general provisions of section 504 by reason of a currently contagious disease or infection. The result is the same: subject to an employer making reasonable accommodation within the terms of his existing personnel policies, the symptomatic or asymptomatic HIV-infected individual is protected against discrimination if he or she is able to perform the duties of the job and does not constitute a direct threat to the health or safety of others.

DOUGLAS W. KMIEC
*Acting Assistant Attorney General*
*Office of Legal Counsel*

Attachment

July 29, 1988

Douglas Kmiec, Esq.
Acting Assistant Attorney General
Office of Legal Counsel
Department of Justice
Washington, D.C.

Dear Mr. Kmiec:

I was pleased to be able to convey to you, at our meeting of July 20, 1988, our medical and public health concerns regarding discrimination and the current HIV epidemic. These concerns will be greatly affected by the extent to which HIV infected individuals understand themselves to be protected from discrimination on account of their infection.

Protection of persons with HIV infection from discrimination is an extremely critical public health necessity because of our limited tools in the fight against AIDS. At this time, we have no vaccine to protect against HIV infection and only one treatment which appears to extend the lives of some persons with AIDS but does not cure the disease. Consequently, the primary public health strategy is prevention of HIV transmission.

This strategy requires extensive counseling and testing for HIV infection. If counseling and testing are to work most effectively, individuals must have confidence that they will be protected fully from HIV related discrimination.

During our meeting you and members of your staff raised a number of perceptive questions concerning the nature of HIV infection including the pathogenesis of the virus and its modes of transmission. Your interest in the scientific aspects of HIV infection is welcome, since it is our belief that any legal opinion regarding HIV infection should accurately reflect scientific reality. As I sought to emphasize during our meeting, much has been learned about HIV infection that makes it inappropriate to think of it as composed of discrete conditions such as ARC or "full blown" AIDS. HIV infection is the starting point of a single disease which progresses through a variable range of stages. In addition to an acute flu-like illness, early stages of the disease may involve subclinical manifestations *i.e.*, impairments and no visible signs of illness. The overwhelming majority of infected persons exhibit detectable abnormalities of the immune system. Almost all, HIV infected persons will go on to develop more serious manifestations of the disease and our present knowledge suggests that all will die of HIV infection barring premature death from other causes. Accordingly, from a purely scientific perspective, persons with HIV infection are clearly impaired. They are not comparable to an immune carrier of a contagious disease such as Hepatitis B. Like a

231

person in the early stages of cancer, they may appear outwardly healthy but are in fact seriously ill. Regrettably, given the absence of any curative therapy for AIDS, a person with cancer currently has a much better chance of survival than an HIV infected individual.

Please do not hesitate to contact me if I can be of any further assistance to you in this matter.

Sincerely,

C. Everett Koop, M.D.
Surgeon General